# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF MARYLAND
# SOUTHERN DIVISION

| | |
|---|---|
| DISABILITY RIGHTS MARYLAND, ) <br> ) <br> *Plaintiff,* ) <br> ) <br> v. ) <br> ) <br> ) <br> PRINCE GEORGE'S COUNTY PUBLIC ) <br> SCHOOLS, *et al.*, ) <br> ) <br> *Defendants.* ) | Case No. 8:21-cv-03001-GJH <br> Judge George J. Hazel |

## REPLY MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION

| | |
|---|---|
| Luciene M. Parsley <br> Megan Berger <br> DISABILITY RIGHTS MARYLAND <br> 1500 Union Ave. <br> Suite 2000 <br> Baltimore, MD 21211 <br> (410) 727-6352 | Theodore A. Howard <br> WILEY REIN LLP <br> 2050 M Street, NW <br> Washington, DC 20036 <br> (202) 719-7000 |

*Attorneys for Plaintiff Disability Rights Maryland*

# TABLE OF CONTENTS

**Page(s)**

TABLE OF AUTHORITIES ................................................................................................. ii

INTRODUCTION AND SUMMARY OF ARGUMENT ........................................................... 1

ARGUMENT .......................................................................................................................... 2

I.  DEFENDANTS' EQUITABLE DEFENSES FAIL TO IMPOSE ANY IMPEDIMENT TO THIS COURT'S FINDING THAT DRM IS ENTITLED TO PRELIMINARY INJUNCTIVE RELIEF ................................................... 2

    A.  Laches ........................................................................................................... 2

    B.  Accord and Satisfaction ................................................................................. 5

    C.  Unclean Hands .............................................................................................. 8

II. NOTHING ABOUT THE PARTIES' COURSE OF INTERACTION PRIOR TO THE FILING OF THIS ACTION IN ANY WAY PRECLUDES A FINDING THAT DRM IS ENTITLED TO PREVAIL ON ITS MOTION ........................................ 9

CONCLUSION ..................................................................................................................... 15

# **TABLE OF AUTHORITIES**

**Page(s)**

**Cases**

*Automobile Trade Assn's v. Harold Folk Enterprises, Inc.*,
   301 Md. 642, 484 A.2d 612 (1985) ...................................................................................6

*Disability Law Ctr. of Alaska, Inc. v. Anchorage Sch. Dist.*,
   581 F.3d 936 (9th Cir. 2009) ...........................................................................................10

*Disability Rights Pennsylvania v. School Dist. of Phila.*,
   377 F. Supp. 3d 482 (E.D. Pa. 2019) ..........................................................................10, 12

*Disability Rights Wisconsin, Inc. v. Wis. Dep't of Pub. Instruction*,
   463 F.3d 719 (7th Cir. 2006) ...........................................................................................10

*Hicks v. Gilbert*,
   135 Md. App. 394, 762 A.2d 986 (2000).........................................................................9

*Jacobs v. Atlantco Ltd. Partnership No. 1*,
   36 Md. App. 335, 373 A.2d 1255 (1977).........................................................................6

*Kimmel v. Safeco Ins. Co.*,
   116 Md. App. 346, 696 A.2d 482 (1997).......................................................................6, 7

*Liddy v. Lamone*,
   398 Md. 233, 919 A.2d 1276 (2007) ................................................................................3

*Majorica, S.A. v. R.H. Macy & Co.*,
   762 F.2d 7 (2d Cir. 1985)..............................................................................................3, 4

*Pasternak & Fidis, P.C. v. Recall Total Information Mgmt.*,
   95 F. Supp. 3d 886 (D. Md. 2015)....................................................................................6

*Quince Orchard Valley Citizens Ass'n, Inc. v. Hodel*,
   872 F.2d 75 (4th Cir. 1989) ...........................................................................................3, 4

*Wells Fargo Home Mortg., Inc. v. Neal*,
   398 Md. 705, 922 A.2d 538 (2007) ..................................................................................9

**Statutes**

20 U.S.C. §§ 1400 *et seq.*...................................................................................................10

20 U.S.C. §1418.................................................................................................................13

42 U.S.C. § 10543 .......................................................................................................................12

42 U.S.C. § 15043 .......................................................................................................................14

Family Educational Rights and Privacy Act ................................................................................13

Maryland Code, Education, §7-306 .............................................................................................14

**Rules and Regulations**

34 C.F.R. § 300.146 .....................................................................................................................13

45 C.F.R. § 1326.26 .....................................................................................................................12

Fed. R. Evid. 408 ...........................................................................................................................6

**Other Authorities**

U.S. Department of Education, *Protecting Student Privacy*,
  https://studentprivacy.ed.gov/content/directory-information (visited February
  15, 2022) ................................................................................................................................13

Plaintiff Disability Rights Maryland, Inc. ("DRM"), by its undersigned attorneys, submits this Reply Memorandum of Points and Authorities in further support of its Motion for Preliminary Injunction (ECF Docket Nos. 7, 7-1), filed November 23, 2021.  For the reasons stated below, DRM submits that Defendants Prince George's County Public Schools ("PGCPS"), Dr. Monica Goldson, the Prince George's County Board of Education ("PGBOE"), and Dr. Juanita Miller have failed – exhaustive and strident rhetoric notwithstanding – to identify any meaningful, substantive basis upon which DRM's Motion must be denied in their Opposition Memorandum ("Opp. Mem.") filed February 4, 2022.  *See* ECF Dkt. No. 26.  Accordingly, the Motion should be granted, and a preliminary injunction issued without further delay.

## **INTRODUCTION AND SUMMARY OF ARGUMENT**

DRM, the State of Maryland's designated agency for purposes of protecting the rights of and advocating for persons with disabilities, is expressly authorized under specific, clearly-worded federal statutes and regulations to seek and obtain information from third parties that is needed by DRM to allow it to perform its critical mission.  In accordance with that authorization, DRM has sought basic contact information from the Defendants in furtherance of DRM's effort to investigate concerns about whether students with disabilities in the PGCPS system have been improperly subjected to various forms of unlawful educational neglect including, but not limited to, the punitive use of exclusionary discipline – suspensions and expulsions – as a response to disability-related conduct, and depriving such students of their rights under the Maryland Constitution and federal and state statutes.

Responding with considerable sound and fury, but no legitimate legal basis, the Defendants repudiated DRM's information requests, necessitating the initiation of this lawsuit and DRM'S request for preliminary injunctive relief.  Having done so, Defendants now seek to defeat DRM's injunction request by invoking a litany of equitable defenses and portraying DRM's concerns regarding educational neglect as involving "'the outer boundaries of the concepts of either "abuse" or "neglect" as defined by the statutes and regulations upon which [DRM] has relief,'" as impediments to findings by this Court in DRM's favor on the critical "likelihood of success" and "irreparable harm" elements of the test for granting a preliminary injunction.  However, as DRM demonstrates below, Defendants' attempted reliance upon facially–inapplicable equitable doctrines is groundless, and their attempt to somehow divorce the

underlying foundation of DRM's investigation from the plain language of the federal laws upon which DRM's position is based is unfounded. The Motion for Preliminary Injunction should be granted.

## ARGUMENT

I. **DEFENDANTS' EQUITABLE DEFENSES FAIL TO IMPOSE ANY IMPEDIMENT TO THIS COURT'S FINDING THAT DRM IS ENTITLED TO PRELIMINARY INJUNCTIVE RELIEF**

Defendants' opening gambit in their attempt to avoid the consequences of a patently clear breach of their obligations to comply with DRM's requests for information is the interposition of three affirmative defenses that they insist prevent this Court from granting preliminary equitable relief: Laches, Unclean Hands and Accord and Satisfaction. Upon scrutiny, however, all three of these defenses prove wholly inapposite under the circumstances presented in this case.

### A. Laches

Defendants start with an exhaustive recitation of their version of the course of interaction between Parties, commencing with DRM's initial request for contact information concerning disabled PGCPS students believed to be the subject of various manifestations of educational neglect in August 2020 and concluding at the point at which an impasse was reached in April 2021. *See generally* Opp. Mem., ¶¶ 1-9 at 3-8. Defendants assert that the equitable doctrine of laches should be applied as a bar to DRM's bid for preliminary injunctive relief, ostensibly because the period of time it took DRM to bring this action fatally undercuts its claim of irreparable harm resulting from Defendants' stonewalling and precludes a finding that DRM is likely to prevail on the merits. *See id*. at 12-13. Defendants are wrong; laches is inapplicable.

Under Maryland common law, the relevant body of authority to which DRM believes this Court should refer to inform its determination in these circumstances:

> [L]aches "is a defense in equity against stale claims, and is based upon grounds of sound public policy[.]" … In its application, "[t]here is no inflexible rule as to what constitutes, or what does not constitute, laches; hence its existence must be determined by the facts and circumstances of each case."
>
> It is, however, well settled that laches "applies when there is an unreasonable delay in the assertion of one's rights *and that delay results in prejudice to the opposing party*." *Frederick Road Ltd. Partnership v. Brown & Sturm*, 360 Md. 76, 117, 756 A.2d 963,

2

> 985 (2000) (emphasis added), *citing Inlet Assoc. v. Assateague House Condominium Ass'n*, 313 Md. 413, 438-39, 545 A.2d 1296, 1309 (1988); *see Ross* [*v. State Board of Elections*], 387 Md. [649,] 669, 876 A.2d [692,] 704 [(2005)] ("[L]aches must include an unjustifiable delay and some amount of prejudice to the defendant."); . . . *Simpers v. Clark*, 239 Md. 395, 403, 211 A.2d 753, 757 (1965) ("[F]or the doctrine [of laches] to be applicable, there must be a showing that the delay [in the assertion of a right] worked a disadvantage to another."); *Hungerford v. Hungerford*, 223 Md. 316, 320-21, 164 A.2d 518, 521 (1960) ("Only two requisites are necessary in order to invoke the doctrine of laches. There must have been some lapse of time during which the plaintiff failed to assert his rights, *and the lapse must have caused some prejudice to the defendant*.") Prejudice is "generally held to be anything that places [the defendant] in a less favorable position." *Ross*, 387 Md. at 670, 876 A.2d at 704[.]

*Liddy v. Lamone*, 398 Md. 233, 243-45, 919 A.2d 1276, 1283-84 (2007) (emphasis added; citations omitted). It is thus clear, under Maryland precedent, that *prejudice to the party seeking to invoke laches is an indispensable element of the defense*. Defendants concede that they "do not claim" that they experienced any prejudice attributable to DRM's purported delay in initiating this action. Opp. Mem. at 12-13. Accordingly, laches, by its own terms, is inapposite.

Despite their admission regarding a lack of any prejudice, Defendant reference *Majorica, S.A. v. R.H. Macy & Co.*, 762 F.2d 7, 8 (2d Cir. 1985), for the proposition that "'[l]ack of diligence, standing alone, may . . . preclude the granting of preliminary injunctive relief, because it goes primarily to the issue of irreparable harm . . . .'" Whatever the validity of that statement in the abstract, however, it has no applicability here, because of the nature of the irreparable harm that DRM asserts.

In the *Majorica* case, the plaintiff complained of economic and business reputational harm attributed to "the alleged unlawful use of the word 'Majorca' as part of the trade name under which Macy sells simulated pearls manufactured on the Island of Majorca." 762 F.2d at 8. The plaintiff, "which sells pearls bearing the registered trade name 'Majorica'," was aware of the alleged trademark infringement by Macy's for several years before it filed its complaint in April 1984, and it did not file its motion for preliminary injunction, asserting "irreparable harm" until November 1984. *Id.* Thus, the Court of Appeals had little difficulty in reaching the conclusion that the harm complained of could not fairly be characterized as "irreparable". Likewise in the only other laches case cited by Defendants – *Quince Orchard Valley Citizens Ass'n, Inc. v.*

3

*Hodel*, 872 F.2d 75, 80 (4th Cir. 1989) – wherein the plaintiff citizens' associations, asserting irreparable harm to the environment in their community attributable to the construction of a highway through a state park pursuant to the granting of certain permits and approvals by local and federal regulatory authorities, were found by the federal district court in which they sought an injunction to have unduly delayed in bringing their case. In affirming the district court's denial of the plaintiffs' motion for preliminary injunction, the Fourth Circuit noted:

> The district court viewed [the] assertion [of irreparable harm] skeptically, . . . because of the Associations' delay in bringing this action. As noted previously, the Associations waited a full nine months after the [National Park Service] granted the necessary approval under section 6(f) of the Conservation Act and the [Federal Highway Authority] issued the final [environmental impact statement]. Nearly six months elapsed between the issuance of the section 404 wetlands construction permit and the filing of the complaint.

872 F.2d at 79. Based on those facts, the appellate court agreed with the district court's conclusion that "[w]hatever irreparable harm Plaintiffs face from impending construction along Alternate 2A is very much the result of their own procrastination." *Id.* (citation omitted).[1]

The irreparable harm DRM seeks to prevent through its request for a preliminary injunction in the case at bar is of a wholly different character than the immediate, concrete and distinct forms of injury asserted by the plaintiffs in the *Majorica* and *Quince Orchard* cases proffered by Defendants. Here, as DRM's Complaint and its Motion for Preliminary Injunction and supporting papers clearly emphasize, DRM has a federally-mandated statutory obligation, *of an on-going, continuous nature*, to "pursue legal, administrative, and other appropriate remedies or approaches to ensure the protection of, and advocacy for, the rights of" individuals with disabilities." *See* Complaint, ¶ 12 at 5 (citations omitted) (ECF Dkt. No. 1); Memorandum of Points and Authorities in Support of Plaintiff's Motion for Preliminary Injunction ("DRM Mem.") at 2 (ECF Dkt. No. 7-1) ("Pursuant to the provisions of the federal statutes invoked in DRM'S Complaint, P&A entities such as DRM have been entrusted with extensive authority to

---

[1] The *Quince Orchard* case provides no support to the Defendants here in any event, because in applying laches as a bar to the granting of injunctive relief in that case, the district court and the Fourth Circuit both noted, and accorded substantial weight to, prejudice to the defendants attributable to the citizens' associations' delay in diligently bringing suit, in the form of their "invest[ment] [of] a significant amount on the design and planning of the last phase of the project[.]" *Id.* at 80. *Quince Orchard*, contrary to Defendants' implication, is not a case in which the plaintiff's delay – "standing alone" – defeated a request for injunctive relief.

4

safeguard people with disabilities and to conduct monitoring of and undertake investigations into potential abuse, neglect and other violations of the rights of disabled persons." (Citations omitted.)).

The irreparable harm of which DRM complains is the frustration of its performance of its critical statutory duties, and that harm continues and will continue for as long as Defendants persist in thumbing their nose at their legal obligation to provide DRM with the information it has requested.[2] There is simply no analogy to be drawn here to, for example, a trademark infringement claim, in which the defendant's alleged infringing conduct triggers immediate harm upon its commencement and each day that passes without legal action on the part of the claimant, once notice of the infringement becomes known, weakens and eventually dilutes the viability of its contention that such harm it is experiencing is "irreparable."

The courts have repeatedly, and uniformly, held that a party's obstruction that prevents a P&A agency from carrying out its on-going statutory mission causes irreparable harm, the cessation of which warrants preliminary injunctive relief. *See* DRM Mem. at 18-19 and case authorities cited therein. So it is in the instant case. Defendants' baseless laches defense must be rejected.

### B.     Accord and Satisfaction

Defendants put forward "the Clean Hands doctrine" as the second equitable defense upon which they seek denial of DRM's request for preliminary injunctive relief. *See* Opp. Mem. at 13-14. However, their explanation for why DRM's hands should be found "unclean" hinges upon the existence of an alleged agreement between the Parties in the nature of a settlement that depends entirely upon the validity of Defendants' third defense: the doctrine of accord and satisfaction. DRM thus focuses on that third defense before addressing the "unclean hands" claim.

The Maryland case authorities reflect a broad consensus regarding the substance of accord and satisfaction.

> "[A]n accord and satisfaction may . . . properly be said to be a method of discharging a contract, or settling a cause of action

---

[2] Without conceding any merit to Defendants' claim, Plaintiff notes that rather than sit on its rights, it is undisputed that DRM repeatedly tried to work with Defendants to obtain the requested contact information. Were the process of engaging in negotiations to result in a determination that such efforts foreclose the right to litigation, this Court would risk creating a jurisprudence wherein parties race to the courthouse instead of exhausting attempts to reach an out-of-court resolution, which is not the rationale upon which the doctrine of laches rests.

> arising either from a contract or a tort, by substituting for such
> contract or cause of action an agreement for the satisfaction thereof
> and the execution of such substituted agreement."

* * *

> "With respect to the terms separately, an accord is an agreement by
> one party to give or perform and by the other party to accept, in
> settlement or satisfaction of an existing or matured claim,
> something other than that which is claimed to be due, and the
> satisfaction is the execution or performance of the agreement, or
> the actual giving and taking of some agreed thing. The accord is
> the agreement and the satisfaction is the execution or performance
> of such agreement. When an accord is followed by a satisfaction,
> it is a bar to the assertion of the original claim, but until so
> followed, it has no effect.

*Jacobs v. Atlantco Ltd. Partnership No. 1*, 36 Md. App. 335, 340, 373 A.2d 1255, 1258 (1977), *quoting* 1 C.J.S. Am. Jur. 2d, *Accord and Satisfaction* § 1 (1936); *see also Automobile Trade Assn's v. Harold Folk Enterprises, Inc.*, 301 Md. 642, 665-66, 484 A.2d 612, 618-19 (1985); *Kimmel v. Safeco Ins. Co.*, 116 Md. App. 346, 361, 696 A.2d 482, 487-88 (1997); *see Pasternak & Fidis, P.C. v. Recall Total Information Mgmt.*, 95 F. Supp. 3d 886, 910-11 (D. Md. 2015).

Defendants' invocation of the doctrine here is premised upon their contention that "the parties resolved their dispute when DRM, by its Letter of April 19, 2021 (Exhibit 9), accepted PGCPS's February 16, 2021 offer (Exhibit [8]) to release the contact information on the seven students who were the subjects of the identified MSDE complaints." Opp. Mem. at 14.[3]

For several reasons, however, which are apparent on the face of the correspondence to which they refer, what Defendants attempt to portray as a final and binding resolution of DRM's information demands was no such thing.

> "To constitute an accord and satisfaction in law . . . it is necessary
> that the offer of money be made in full satisfaction of the demand
> or claim of the creditor, and be accompanied by such acts or
> declarations as amount to a condition that if the money is accepted,
> it is to be in full satisfaction and of such character that the creditor
> is bound to understand the offer."

---

[3] In addressing the substance of Defendants' accord-and-satisfaction argument made in reliance on the contents of written correspondence exchanged by the Parties which was expressly designated as "Privileged Settlement Communication[s]" – *see* Opp. Mem., Exs. 8, 9 – DRM does so without prejudice and hereby reserves it right to object to Defendants' submission of these letters in contravention of Fed. R. Evid. 408.

6

> Professor Corbin, in this treatise on the law of contracts (*Vol. 6, § 1277, 1962*), puts it this way:
>
> *"There must be accompanying expressions sufficient to make the creditor understand, or to make it unreasonable for him not to understand, that the performance is offered to him as full satisfaction of his claim and not otherwise."*

*Kimmel*, 696 A.2d at 488, *citing Washington Homes v. Baggett*, 23 Md. App. 167, 174, 326 A.2d 206, 210 (1974) (emphasis added). Viewed in light of this requirement, the very provisions of the PGCPS letter of February 16, 2021 that Defendants claim gave rise to an "accord" between the Parties actually reveal why it could not have done so – as a matter of law. In that letter, PGCPS' counsel, on its behalf, provided DRM with a multi-part offer of compromise including the following:

> 3. PGCPS will provide DRM with the contact information requested on the students who are the subject of each of the MDSE cases identified in paragraph 5 of the [Probable Cause Certification];
>
> \*   \*   \*
>
> 6. Prior to instituting any judicial or administrative action against PGCPS relative to this matter, DRM will provide PGCPS with a revised PCC that sets forth detailed facts demonstrating probable cause to believe that PGCPS is guilty of neglect pursuant to the P&A statutes; and
>
> 7. Within seven days of receipt of DRM's revised PCC, PGCPS will provide DRM with the requested contact information on additional students as justified by DRM's revised PCC, and DRM is free to pursue whatever remedies it believes appropriate at that time.

*See* Opp. Mem., Ex. 8 at 4.

The quoted provisions, notably glossed over by Defendants, make it perfectly clear that PGCPS' offer to provide DRM with contact information on seven specific students could not have been either understood or intended *by PGCPS* to constitute the basis for a complete resolution of the Parties' dispute if accepted by DRM, and could not possibly have been understood as such by DRM – the "creditor" by analogy to the definitions quoted above from the *Kimmel* case. Rather, it is readily apparent that PGCPS was aware that provision of the information set forth in ¶ 3 of its multipart offer might still be followed by DRM's initiation of

7

legal proceedings (¶ 6), and that even if PGCPS provided additional contact information upon its receipt and review of a revised Probable Cause Certification from DRM, DRM would remain "free to pursue whatever remedies it believes appropriate at that time" (¶ 7). Plainly, there is no foundation for the "accord" element of Defendants' accord and satisfaction argument.

Moreover, even after DRM, in its responsive letter dated April 19, 2021, agreed to accept PGCPS' offer "to provide the names and contact information of the seven (7) students who are the subject of the MSDE cases" – Opp. Mem., Ex. 9 – PGCPS repudiated its commitment to provide this information, failing to do so until 8 months later, after this lawsuit was already filed. Opp. Mem, ¶ 10. This belated action could not, under any possible stretch of the applicable legal principles involved, constitute a timely "satisfaction" consummating the "resolution" that Defendants seek to interpose as a bar to injunctive relief.

As the very evidence upon which Defendants purport to rely – on its face – defeats their contention that an accord and satisfaction was reached between the Parties, this contrived defense necessarily fails.

    C.    **<u>Unclean Hands</u>**

The linchpin of Defendants' assertion that preliminary injunctive relief should be deemed unavailable to DRM based on the "clean hands doctrine" is their fanciful assertion that the Parties resolved their dispute through an accord and satisfaction reached when DRM accepted PGCPS' offer to provide certain limited contact information for a small number of the disabled children encompassed by DRM's requests for information. As demonstrated above – *see* Argument Section I.B., *supra* – no such resolution was reached. As a result, PGCPS' argument that DRM somehow engaged in "inequitable conduct" by bringing this lawsuit and seeking a preliminary injunction without first "attempt[ing] to contact PGCPS or its representatives, either orally or in writing, about receiving the information pursuant to the agreement of the parties" (Opp. Mem. at 13), defies reality.

> The unclean hands doctrine "refuses recognition and relief from the court to those guilty of unlawful or inequitable conduct pertaining to the matter in which relief is sought." It is "not applied for the protection of the parties nor as a punishment to the wrongdoer." *Adams v. Manown*, 328 Md. 463, 474-75, 615 A.2d 611, 615 (1992). Rather, it protects the integrity of the court and the judicial process by denying relief to those persons "whose very presence before a court is the result of some fraud or inequity."

8

> *Manown [v. Adams]*, 598 A.2d 821, 824 [(1991)]; *see also Niner v. Hanson*, 217 Md. 309, 142 A.2d 798 (1958).
>
> There must be a nexus between the misconduct and the transaction, because "[w]hat is material is not that the plaintiff's hands are dirty, but that he dirties them in acquiring the right he now asserts." *Adams*, 615 A.2d at 617 (citing D. Dobbs, *Remedies* § 2.4 at 46 (1973)); *see also Schneider v. Schneider*, 96 Md. App. 296, 306, 624 A.2d 1319, 1324 (1993) ("It is only when plaintiff's improper conduct is *the source, or part of the source*, of his equitable claim, that he is to be barred because of this conduct.").

*Hicks v. Gilbert*, 135 Md. App. 394, 401, 762 A.2d 986, 989-90 (2000); (emphasis in original; citations omitted); *see also Wells Fargo Home Mortg., Inc. v. Neal,* 398 Md. 705, 729-30, 922 A.2d 538, 552 (2007).

Considered in light of these principles, the absurd nature of Defendants' "unclean hands" argument is laid bare. Defendants, in essence, contend that *after PGCPS breached its promise to provide DRM with certain information regarding a limited number of specific children and cases that it had offered to provide,* DRM somehow had an affirmative obligation to contact PGCPS to pursue the withheld information, and that DRM's failure to do so before bringing this action amounts to "fraud or inequity" so egregious as to foreclose DRM's entitlement to information that federal statutes and regulations unambiguously empower DRM to obtain. Such advocacy does not merit this Court's serious consideration and should be summarily rejected.

II. **NOTHING ABOUT THE PARTIES' COURSE OF INTERACTION PRIOR TO THE FILING OF THIS ACTION IN ANY WAY PRECLUDES A FINDING THAT DRM IS ENTITLED TO PREVAIL ON ITS MOTION**

Bereft of the meritless affirmative defenses they have invoked as a threshold basis for defeating the granting of preliminary injunctive relief, Defendants are confronted with DRM's straightforward recitation demonstrating – by specific reference to the plain language of the federal statutes and regulations upon which it relies – its entitlement to the information it has sought from PGPCS. *See generally* DRM Mem. at 9-18 & nn. 3-4. But rather than address DRM's analysis and legal arguments in a forthright manner, Defendants have chosen instead to revisit and rely upon the correspondence their counsel exchanged with DRM before the lawsuit commenced, referring this Court to extensive block quotes from prior letters in which Defendants claim to have comprehensively responded to and rebutted the stated grounds for DRM's information requests. Opp. Mem. at 15-25 & nn. 4-7.

9

While DRM does not presume to criticize the efficacy of Defendants' chosen mode of advocacy in this regard, it is difficult to avoid the conclusion that their choice to reproduce -- at great length -- previous communications rather than directly respond to DRM's arguments tends to obfuscate, rather than illuminate, the issues this Court must decide. In any event, however articulated, Defendants' positions lack merit and must be rejected.

Initially, Defendants seek to portray DRM's "over-arching theory of 'educational neglect'" as a somehow revolutionary concept on the outer fringe of the understandings of "abuse" and "neglect" embodied in the P&A Acts and their supporting regulations. Opp. Mem. at 15.[4] Based on this false premise, they leap to the inference that this Court's adoption of DRM's conception would "make new law that would have the practical effect of giving [DRM] unfettered access to student information" – an outcome they insist is "uniquely inappropriate for disposition by way of a mandatory preliminary injunction[.]" *Id.* at 16.

With respect, Defendants engage in pure sophistry. In truth, and as DRM has already shown, there is nothing *whatsoever* novel or new about the proposition that the kind of concerns that DRM is seeking to investigate with respect to the treatment of disabled students in the PGCPS system about which it has received reports fall squarely within the concepts of "abuse" and "neglect" as expressly defined by the P&A Acts and supporting regulations. *See* Complaint ¶ 15 at 6-7; DRM Mem. at 13-15; *see generally Disability Law Ctr. of Alaska, Inc. v. Anchorage Sch. Dist.*, 581 F.3d 936, 939-40 (9th Cir. 2009); *Disability Rights Wisconsin, Inc. v. Wis. Dep't of Pub. Instruction*, 463 F.3d 719, 726 (7th Cir. 2006). As DRM noted in its motion papers, in *Disability Rights Pennsylvania v. School Dist. of Phila.*, the federal district court directly addressed – and flatly rejected – the defendant school district's argument that alleged conduct interfering with disabled children's rights to a "free appropriate public education" under 20 U.S.C. §§ 1400 *et seq.* did not constitute abuse and/or neglect as defined by the P&A Acts. *See* 377 F. Supp. 3d 482, 485-86 (E.D. Pa. 2019).[5] Contrary to Defendants' assertions that DRM's

---

[4] Defendants' surprising contention that DRM concedes this proposition – *see* Opp Mem. at 1 – is flatly false and made up of whole cloth. The language in DRM's Memorandum to which Defendants point as grounds for their misrepresentation is DRM's description of an argument previously advanced by PGCPS, and not by DRM. *See* DRM Mem. at 13.

[5] Defendants' contention that the school district defendant in *Disability Rights Pennsylvania* "never raised the definitional issues addressed" in this case – Opp. Mem. at 19, *quoting* Opp. Mem., Ex. 4 at 7-8 – is thus clearly wrong. The district court, in deciding the case on the grounds that plaintiff DRP was not required to establish probable cause under the P&A Act and C.F.R. provisions pursuant to which it sought the same type of contact

investigation of the denial of a child's education is "novel" or on the "outer boundaries" of settled law, a child's right to education is universally seen as fundamental. Maryland has embedded this right into its state Constitution and it is plain why federal law would authorize protections of such rights by a P&A.  DRM has documented its receipt of complaints from multiple sources and across the school system of PGCPS' failures to provide students with disabilities with equal access to education, its failures to accommodate and support students with disabilities, and its failures to establish, develop and implement disabled students' Individualized Education Programs and Behavior Intervention Plans.  The complaints also allege that instead of responding to students' challenging, disability-related behaviors with appropriate supports, PGCPS responds with punitive, exclusionary discipline and fails to consider the relationship between a child's behavior and his/her disability in order to offer needed accommodations or otherwise conform with PGCPS' legal obligations. It is offensive for Defendants - as educators - to suggest that wrongfully abridging students' educational rights cannot constitute educational neglect.  Defendants' strident insistence that DRM's allegations of possible "educational neglect" are too radical to serve as the basis for the Court's determination that DRM's right to relief "is 'indisputably clear'" (Opp. Mem. at 16), completely lacks foundation.

      Next, Defendants protest that the sources referred to and relief upon by DRM as the basis for its information requests to PGCPS are somehow inadequate to serve as grounds for DRM's claims of probable cause to investigate.  Opp. Mem. at 16-17.  In particular, Defendants challenge DRM's invocation of the "over 85 complaints" it has received since January 2018 about disciplinary practices affecting disabled children in the PGCPS system perceived by DRM to implicate concerns of educational neglect giving rise to the need for an investigation.  In this regard, Defendants state that "this 85 call figure is grossly inflated since, as DRM acknowledges, it covers *special education students in general, not special education students receiving disciplinary removals, who are the subject of DRM's demand for student contact information*. Opp. Mem. at 16-17 (emphasis in original).

      Again, Defendants are mistaken.  Putting aside, for the sake of argument, the broader point that no probable cause showing is even required to support DRM's request for the contact

---

information as DRM seeks here, necessarily determined that the alleged conduct plaintiff DRP was investigating constituted abuse and/or neglect as defined, or relief would necessarily have been denied.

11

information at issue – a point Defendants studiously ignore[6] – it is clear on the face of the second paragraph of DRM's revised Probable Cause Certification conveyed to PGCPS on or about April 19, 2021 that the "84 plus" complaints referenced by DRM involved "exclusionary discipline and accompanying concerns of educational neglect." Opp. Mem., Ex. 9.a. at 1.

Defendants next reprise PGCPS' earlier argument that the grounds articulated by DRM in support of its information requests did not provide PGCPS with a "means of ascertaining whether any of the students for whom information was requested met the statutory definitions under PADD for the term 'developmental disability' (42 U.S.C. § 15022(8)) or under PAIMI for the term 'individual with a mental illness' (42 U.S.C. § 10802)[.]" Opp. Mem. at 18; *see also id.* at 25. But, in resurrecting this complaint, Defendants conveniently disregard the fact that, as shown by DRM in responsive pre-litigation correspondence, no such ascertainment by PGCPS was necessary, because the courts have uniformly held that "'P&A systems need not "make a threshold showing" of mental illness or developmental disability in order to exercise P&A access authority.'" *See* Opp. Mem., Ex. 5 at 4 (citing authorities). As DRM further explained in the same correspondence:

> Here, the students for whom we seek contact information are all special education students identified under the Individuals With Disabilities Education Act with disabilities sufficient to authorize an investigation of incidents of alleged abuse or neglect pursuant to the [P&A Acts]. Based on the complaints received and DRM's subsequent investigations and representation of students in PGCPS, DRM has direct knowledge that there have been and are students in PGCPS who fall within our requested categories for contact information and who have autism, Attention Deficit Hyperactivity Disorder, emotional disability, intellectual disability, depression, and learning disability, among other disabilities.

*Id.* Notably, PGCPS had no meaningful rejoinder to DRM's assertions then, and it provides none now. Revisiting the fact that PGCPS previously interposed groundless arguments to which DRM has already cogently responded adds volume, but no persuasive force, to Defendants' effort to defeat DRM's motion.[7]

---

[6] *See* DRM Mem. at 15, *citing Disability Rights Pennsylvania*, 377 F. Supp. 3d at 486; 42 U.S.C. § 10543(a)(2)(B); *and* 45 C.F.R. § 1326.26.

[7] Defendants, on an interrelated point, contend that DRM's motion papers set up and knock down a "straw man" argument that PGCPS never articulated as a basis for stonewalling DRM's information requests – *i.e.*, that DRM never "provided written authorization from affected students' parents or guardians to access their records." Opp. Mem. at 24. Defendants' protestations to the contrary notwithstanding, however, in PGCPS' initial response to

Regarding a lament that echoes throughout the entirety of their Opposition, Defendants insist that the purportedly "unprecedented" scope of the production obligations that granting DRM's request for preliminary injunctive relief would impose upon PGCPS, both as regards the nature of the information involved and its presumptive volume, justifies the denial of DRM's motion. *See* Opp. Mem. at 2, 6, 7, 11, 16 (referencing the "Draconian measure of [requiring PGCPS to release to DRM] personally identifiable student information on approximately 1,000 unnamed special education eligible students"), 19, 26, 27. The magnitude of Defendants' complaints in this regard should not be confused with merit; none exists.

What Defendants characterize as the "personally identifiable student information" sought by DRM's requests is actually the functional equivalent of what the Family Educational Rights and Privacy Act ("FERPA") defines as "directory information" – the release of which, under FERPA, is not generally considered harmful or to implicate any invasion of privacy. *See generally U.S. Dep't of Education, Protecting Student Privacy*, https://studentprivacy.ed.gov/content/directory-information (visited February 15, 2022). More importantly, as DRM has already emphasized, federal law requires DRM to maintain the confidentiality of the contact information it may obtain from PGCPS, and it may follow up to seek and obtain additional information about the students whose contact information it is provided only to the extent such student's parent or legal guardian provides written authorization to do so. *See* DRM Mem. at 21 (citing authorities). The concerns Defendants purport to express on the basis of the nature of the information PGCPS might be compelled to disclose to DRM are thus wholly unfounded.

Defendants' claim that providing DRM with the requested contact information would be a "significant undertaking" – Opp. Mem. At 26 – appears to be similarly unfounded. PGCPS, like every school district in Maryland, is required to collect and report to the Maryland State Department of Education the number of children receiving special education services who are suspended or expelled.[8] The information requested by DRM should thus be readily available and

---

DRM, it expressly stated: "DRM's request is improper because it does not meet the statutory definition of abuse and neglect; thus, *PGCPS may not provide student record information without a signed authorization or specified exception to release this information."* Opp. Mem., Ex. 2 at 2 (emphasis added).

[8] The Individuals with Disabilities Education Act mandates that States provide data each year to the Secretary of Education and the public on the use of long term suspensions and expulsions (20 U.S.C. §1418(a)(1)(A)(v)(III)), and on the incidence and duration of disciplinary actions, including suspensions of one day or more, by race, ethnicity, limited English proficiency status, gender, and disability category (20 U.S.C. §1418(a)(1)(D)). 34 C.F.R. § 300.14

13

the identity of the students known. This seems apparent from the speed with which PGCPS provided DRM with the total number of students suspended in each category that DRM requested, in its initial response to DRM dated September 2, 2020. *See* Opp. Mem., Ex. 2 at 4,5.

As to the volume of the information implicated by DRM's request for injunctive relief, though not relevant to the merits of this action, it is surely due in part to Defendants' refusal to provide the basic information when it was initially requested. Moreover, if PGCPS had simply acknowledged its obligation to adhere to applicable law under the P&A Acts and regulations, it could have – to the extent it deemed necessary or appropriate – sought to confer amicably with DRM regarding any concerns about the scope of production, as DRM offered. Instead, PGCPS determined to dig in its heels and obstinately resist DRM's several efforts to arrive at a negotiated resolution. Defendants, under these circumstances, are in no position to complain about the degree of such burden – *if any* – as they must actually confront as a result of their strategic decision to embark on a course of scofflaw behavior.

Lastly, in response to Defendants' claim that "no public purpose is served" by providing DRM with the requested contact information and its demand that "DRM should be forthcoming with the Court with exactly what it intends to do with the information," (Opp. Mem. At 28), DRM's response is simple (and unapologetic). DRM anticipates that it will do that which Congress expects and intends of the P&A. DRM will investigate and, to the extent warranted by its investigation, pursue legal, administrative, or other appropriate remedies, to ensure the protection of, and advocacy for, the rights of people with disabilities. *See, e.g.*, 42 U.S.C. § 15043 (a)(2) (DD Act). This is the *mandate* of the P&A, as created by Congress to serve the public's interest in prohibiting disability discrimination by public entities, including school systems. Without the preliminary injunction, DRM will remain unable to pursue its responsibility and the harm to it and its constituents. That harm is clearly presented in DRM's Motion for Preliminary Injunction and supporting papers and is ongoing as children and youth with disabilities continue to face alleged educational neglect and exclusionary discipline

---

requires that the Maryland State Department of Education (MSDE) determine whether there are significant discrepancies in the rate of long-term suspensions and expulsions of students with disabilities (SWD) compared to such rates for non-SWD within each local school system. MD Code, Education, §7-306 requires that the MSDE must disaggregate information in every student discipline report for the State, each local school system, and each public school by: (1) race; (2) ethnicity; (3) gender; (4) disability status; (5) eligibility for free or reduced-price meals or an equivalent measure of socioeconomic status; and (6) English language proficiency. Special education-related data must be disaggregated by race, ethnicity, and gender.

attributable to Defendants' actions, which have resulted in years of disparate and disproportionate impact on students with disabilities and the suspension of more students than any other school district in the state. *See* DRM Mem. at 3-5; *see also* Opp. Mem., Ex. 9.a. at 4.

## CONCLUSION

DRM's opening Memorandum and this Reply Memorandum conclusively demonstrate its satisfaction of the four criteria required for the granting of preliminary injunctive relief. The plain language of the P&A Acts and supporting regulations pursuant to which its information requests to PGCPS were made establish DRM's substantial likelihood of success on the merits; Defendants' steadfast refusal to meet their obligations under applicable law to provide DRM with the contact information it seeks has caused and continues to cause DRM irreparable harm by preventing it from carrying out its federally-mandated mission; and both the balance of relative harms and the public interest strongly favor the issuance of an injunction. Defendants' efforts to show otherwise are completely unavailing.

For all of the foregoing reasons, DRM's Motion for Preliminary Injunction should be granted.

DATED: February 18, 2022                    Respectfully submitted,


/S/
Luciene M. Parsley, Fed. Bar No. 27089
DISABILITY RIGHTS MARYLAND
1500 Union Ave.
Suite 2000
Baltimore, MD 21211
Telephone: (410) 727-6352, x2494
Facsimile: (410) 727.6389
LucieneP@DisabililtyRightsMD.org


/S/
Megan Berger, Fed. Bar No. 21705
(signed by Luciene Parsley with permission of Megan Berger)
DISABILITY RIGHTS MARYLAND
1500 Union Ave.
Suite 2000
Baltimore, MD 21211
Telephone: (410) 727-6352, x2504

        Facsimile: (410) 727-6389
        Megan.Berger@DisabilityRightsMD.org

        and

/S/ _____
Theodore A. Howard (admitted *pro hac vice*)
(signed by Luciene Parsley with permission of Theodore A. Howard)
WILEY REIN LLP
2050 M Street, NW
Washington, DC 20036
Telephone: (202) 719-7000
Facsimile: (202) 719-7049
thoward@wiley.law

*Attorneys for Plaintiff Disability Rights Maryland*

## CERTIFICATE OF SERVICE

I hereby certify that on this 18th day of February 2022, true and correct copies of the foregoing Reply Memorandum of Points and Authorities in Support of Plaintiff's Motion for Preliminary Injunction were served upon all counsel of record *via* the Court's CM/ECF electronic filing system.

/S/ _____
Luciene M. Parsley